IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

PIEDMONT BEHAVIORAL HEALTH
CENTER, LLC, et al.,

          Plaintiffs,

v.                                   CIVIL ACTION NO.  2:04-cv-946

DAVID STEWART, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the motion for partial summary judgment of the plaintiffs [Docket 73], the motion for summary judgment of defendants Dr. David Stewart and the West Virginia Department of Education [Docket 71], and the motion for summary judgment of defendants Paul Nusbaum and the West Virginia Department of Health and Human Resource [Docket 75]. For the reasons stated herein, the court **GRANTS** the defendants' motions for summary judgment and **DENIES** the plaintiffs' motion for partial summary judgment.

**I.    BACKGROUND**

The parties dispute whether the defendants are responsible for paying the costs of educating a West Virginia resident who was placed in an out-of-state, long-term psychiatric treatment facility by his mother. The plaintiffs are John Doe, a West Virginia minor; Jane Doe, his mother; and two out-of-state psychiatric care facilities, Piedmont Behavioral Health Center and Woodside Hospital,

1

LLC. The plaintiffs contend that the West Virginia Department of Education ("WVDOE"), the West Virginia Department of Health and Human Resources ("WVDHHR"), and their respective directors are responsible for the costs of educating John Doe while he resided at Piedmont. They also assert that these defendants are responsible for the expenses associated with educating an unspecified number of similarly situated West Virginia minors. The plaintiffs make statutory claims against the defendants pursuant to the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1983, the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), the West Virginia Human Rights Act, and the West Virginia Education of Exceptional Children Act. The plaintiffs also claim the defendants breached a contract and violated constitutional rights afforded by the United States Constitution and the West Virginia Constitution. Finally, the plaintiffs request the court to declare the legal rights and relations regarding the defendants' alleged obligation to pay for the educational services of West Virginia minors placed in Piedmont and Woodside.

The plaintiffs allege the following facts. John Doe, a West Virginia resident, has experienced severe behavioral and emotional problems since an early age. (Jane Doe Dep. at 13, Aug. 22, 2005.) Because of these problems, John has had an individualized education plan ("IEP") since he was in kindergarten. (*Id.* at 14.) In January 2003, according to Ms. Doe, her son entered a period of emotional crisis. (*Id.* at 28.) To avoid potential behavioral issues, Ms. Doe convened a meeting of her son's IEP team. (*Id.* at 26.) She suggested changes to John's IEP during this meeting because she believed that "something was going to happen." (*Id*. at 26.) The IEP team, however, refused to modify John's plan. (*Id.* at 26–27.) A few days later, John took a knife to school, was involved in a skirmish with a student, confronted a staff member, and was suspended for 45 days. (*Id.* at 25.) Within days of John's suspension, his emotional crisis worsened, and he

attempted to commit suicide.  (*Id.* at 25–26*.*)

John was treated at a local hospital and eventually transferred to Highland Hospital, a short-term treatment facility in Charleston, West Virginia.  (*Id.* at 29.)   Because Highland was a short-term facility, John could remain at the facility for only a limited period of time.  Ms. Doe claims that when John could no longer remain at Highland, WVDHHR officials gave her the choice of placing John in Piedmont or having the WVDHHR file a "going-against-medical-advice petition," which she claims inevitably would have resulted in the WVDHHR taking custody of John and placing him in Piedmont.  (*Id.* at 38.)  Instead of waiting for a petition to be filed with a court and a judicial determination, Ms. Doe decided to place John in Piedmont in or around March 2003.  (*Id.* at 10.)  At the time of John's placement, Ms. Doe signed a form acknowledging that she was responsible for his placement and that she was financially responsible for expenses incurred while John resided at Piedmont.  (*Id.* at 59.)  Neither Ms. Doe nor any West Virginia state agency has paid Piedmont for John's educational expenses. (*Id.* at 56.)

 According to Ms. Doe, she attempted to convene IEP team meetings after John's placement at Piedmont, but school officials did not attend these meetings.  (*Id.* 31.)  Approximately one year after John's placement in Piedmont, Ms. Doe removed him.  He is currently in the custody of the WVDHHR and has been placed in another treatment facility.[1]  (*Id.* 54.)

Ms. Doe acknowledges that, other than this lawsuit, she never formally objected to any of the decisions or actions of her son's IEP team.  (*Id.* 32–33.)  In addition, the plaintiffs do not claim that Ms. Doe availed herself of any of the IDEA's administrative remedies, such as filing an

---

[1] Ms. Doe stated in her deposition that the WVDHHR currently has custody of John because of an "abuse and neglect situation."  (*Id.* at 54.)  The record regarding this matter is not fully developed.

3

administrative complaint or requesting a due process hearing.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor . . . ." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A. Plaintiffs' IDEA claim

The plaintiffs claim that, pursuant to the IDEA, the defendants are responsible for John Doe's educational expenses incurred while he resided at Piedmont.

Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d) (2000). The IDEA accomplishes this goal by requiring states that accept IDEA funding to comply with substantive and procedural IDEA guidelines. *Id.* § 1412(a). Pursuant to the IDEA, states that accept IDEA funds must develop, review, and revise an IEP for each disabled child. *Id.* § 1412(a)(4). The IEP is a customized educational model designed to meet a disabled child's educational needs and accomplish the goals of the IDEA. *Bd. of Educ. of the County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 602 (S.D. W. Va. 2000).

Although Congress intended to accomplish the goals of the IDEA through public school systems, the IDEA allows for the placement of disabled children in private schools at public expense if a school district cannot, or refuses to, provide disabled children with an appropriate public education. 20 U.S.C. § 1412(a)(10)(c) (2000); *see Michael M.*, 95 F. Supp. 2d at 601–02. Under some circumstances, school systems can be required to pay for a disabled child's private education even if a parent unilaterally decides to place a child in a private school. When a parent unilaterally places a child in a private school, school authorities must pay the cost of the child's education if a court determines that the placement, rather than the IEP, is proper under the IDEA. *Sch. Comm. of Burlington v. Dep't. of Educ.*, 471 U.S. 359, 369 (1985).

In this case, Ms. Doe decided to place her son in a private facility. She claims, along with the other plaintiffs, that the defendants are responsible for the costs of educating John while he resided at Piedmont. For the reasons set forth below, however, the court **FINDS** the plaintiffs lack standing to assert an IDEA claim.

1. <u>Piedmont and Woodside lack standing to assert an IDEA claim.</u>

The standing of Piedmont and Woodside turns on whether they are "aggrieved parties" under the IDEA. The plaintiffs argue that Piedmont and Woodside are "aggrieved parties" because they have a "vested interest" in receiving payment for the educational services they provided to John Doe. Because Piedmont and Woodside do not have access to the IDEA's procedural safeguards, however, the court **FINDS** that they are not aggrieved parties and, therefore, lack standing to assert an IDEA claim.

Parties who seek to invoke the jurisdiction of a federal court must meet the Article III threshold requirement of standing by alleging an actual case or controversy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "The burden of establishing standing to sue lies squarely on the party claiming subject-matter jurisdiction." *Frank Krasner Enter., Ltd. v. Montgomery County*, 401 F.3d 230, 234 (4th Cir. 2005) (citation omitted). To meet the "irreducible constitutional minimum" requirements for standing, a plaintiff must show that: (1) the plaintiff has suffered an injury in fact; (2) the injury is fairly traceable to the action challenged by the plaintiff; and (3) "it [is] 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). As for the standing of Piedmont and Woodside, the third element is at issue. If this court cannot redress the alleged injury of Piedmont and Woodside through the IDEA's procedural safeguards, then Piedmont and Woodside lack standing to assert an IDEA claim.

"When Congress wishes to allow private parties to sue to enforce federal law, it must clearly express this intent." *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 683 (2003) (Thomas, J., concurring in part and concurring in judgment). Without a clearly expressed intent to

create a cause of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). To determine whether Congress intended for the IDEA to create a cause of action for entities such as Piedmont and Woodside, the court must engage in a two-step inquiry. First, the court must examine whether the IDEA provides private education providers access to the IDEA's procedural safeguards. Because the court answers this question in the negative, the court must then consider whether entities that cannot avail themselves of the IDEA's procedural safeguards can bring an IDEA claim in a federal court. The court also answers this question in the negative.

The court's analysis of whether Piedmont and Woodside have access to the IDEA's procedural safeguards begins with an evaluation of the express language of 42 U.S.C. §§ 1412 and 1415. Pursuant to § 1415, states that accept IDEA funding are required to establish procedures "to ensure that *children with disabilities and their parents* are guaranteed procedural safeguards . . . ." 20 U.S.C. § 1415(a) (2000) (emphasis added). Similarly, § 1412(a)(6) provides: "*Children with disabilities and their parents* are afforded the procedural safeguards required by section 1415 of this title." (Emphasis added). Among these safeguards is the requirement that states implement an impartial administrative process to allow the filing of complaints with state or local educational authorities. *Id.* § 1415(b). When a complaint is filed, "the *parents* involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted . . . as determined by State law or by the State educational agency." *Id.* § 1415(f)(1) (emphasis added).

The plain language of §§ 1412 and 1415 unambiguously provide disabled children and parents of disabled children administrative remedies to address IDEA-related disputes. A review

7

of the IDEA, however, reveals no such intent to provide private entities seeking reimbursement for the costs of educating disabled children access to these procedural safeguards.

The stated purposes of the IDEA support this conclusion. Congress intended the IDEA to effectuate two primary goals. *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 297 (4th Cir. 2005). First, Congress wanted to provide "children with disabilities a 'free appropriate public education' . . . emphasizing 'special education and related services.'" *Id.* (quoting 20 U.S.C. § 1400(c) (2000)). "Second, it sought to ensure that the rights of disabled children and their parents were protected." *Id.* Viewing these objectives together, the Fourth Circuit concluded that "Congress thus provided substantive rights to disabled children and gave *children and their parents* procedural rights." *Id.* (citing *AW ex rel. Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 674, 678 (4th Cir. 2004)) (emphasis added); *see also Doe v. Bd. of Educ.*, 165 F.3d 260, 263 (4th Cir. 1998) (finding that the child is "the real party in interest in *any* IDEA proceeding.") (Emphasis in original). These stated purposes clearly suggest that Congress intended the IDEA to protect the rights and interests of disabled children and their parents, not the rights of private entities with a "vested" financial interest. Considering the express language of the statute and the stated purposes of the IDEA, the court **FINDS** that Congress did not intend for the IDEA to provide procedural safeguards to private education providers such as Piedmont and Woodside.

The court now examines whether Piedmont and Woodside can bring an IDEA claim in this court notwithstanding the fact that they cannot pursue procedural safeguards. Under the IDEA, "[a]ny party aggrieved by the findings and decisions [of administrative proceedings] shall have the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 42 U.S.C. § 1415(i)(2)(A) (2000).

As noted, the plaintiffs contend that Piedmont and Woodside are "aggrieved parties" because they have a vested financial interest in the IDEA's procedural safeguards.

The IDEA's statutory language simply does not support the plaintiffs' contention. Sections 1412 and 1415 ensure that procedural safeguards exist for "children with disabilities and their parents," not for entities with a vested financial interest in IDEA proceedings. Although Woodside and Piedmont may indeed be "aggrieved" because they have allegedly suffered financial injury, the IDEA does not provide a mechanism for such entities to seek redress. This court is not empowered to create a private cause of action, and I therefore **FIND** that the IDEA does not provide Piedmont and Woodside the right to bring a private cause of action.

This finding is supported by relevant IDEA case law. Most notably, United States District Judge Hudson in the Eastern District of Virginia reached an identical conclusion, observing that "[o]nly the parents of a disabled child can be 'aggrieved parties' who have a private cause of action under 20 U.S.C. § 1415(f) and (i)." *Va. Office of Prot. and Advocacy v. Va. Dep't of Educ.*, 262 F. Supp. 2d 648, 661 n.5 (E.D. Va. 2003).

Addressing closely analogous facts, the Third Circuit recently reached a similar conclusion. In *Lawrence Township Board of Education v. New Jersey*, a school district brought a cause of action against New Jersey seeking reimbursement for the costs to educate a disabled child. 417 F.3d 368 (3d Cir. 2005). The court affirmed a district court's dismissal of a local educational agency by finding that the language of § 1412 "strongly suggests that Congress intended to provide a private right of action only to disabled children and their parents."[2] *Id.* at 372.

---

[2] The plaintiffs rely primarily on a Seventh Circuit case, *Family & Children's Center, Inc. v. School City of Mishawaka*, 13 F.3d 1052 (7th Cir. 1994), and an unpublished Southern District of New York opinion, *Brooklyn School for Special Children v. Crew*, 1997 WL 539775

9

This court similarly cannot provide Piedmont and Woodside an IDEA procedural safeguard that Congress has reserved for disabled children and their parents.

2. <u>John and Jane Doe lack standing to assert an IDEA claim.</u>

As is the case with Piedmont and Woodside, Ms. Doe and her son lack standing to assert an IDEA claim against the defendants.

The Doe's lack the first and most basic of the Article III standing requirements. They have not shown, or for that matter sufficiently alleged, that they have suffered an injury in fact. As previously explained, a plaintiff must show that he has suffered an injury in fact to have standing to sue. *Lujan*, 504 U.S. at 560. The Fourth Circuit explains that a plaintiff must be subjected to "an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Emery,* 432 F.3d at 298 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc)). In addition, "[t]he injury cannot be 'conjectural or hypothetical.'" *Id.* (citing *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 319 (4th Cir. 2002)).

This case differs from most IDEA cases because the plaintiffs are not requesting the court to enforce an IEP, change an IEP, or reimburse a child's parents for incurred educational expenses. Also inapposite of most IDEA claims, the plaintiffs do not contend that John did not receive an

---

(S.D.N.Y. Aug. 28,1997), to support their contention that the term "any aggrieved party" should be defined broadly. As observed by the defendants, the facts in these cases are easily distinguishable from the facts of the case before the court. In both of the cases relied upon by the plaintiffs, the relevant states adopted broader regulatory schemes than the IDEA requires and thus expanded the IDEA's safeguards. *See Family & Children's Center*, 13 F.3d at 1060; *Brooklyn School for Special Children*, 1997 WL 539775, at *3–4, 11. To some extent, each of the courts relied on the respective states' expansive adoption of the IDEA in making their findings. *Id.* West Virginia, however, has not expanded the scope of the IDEA in the areas relevant to this opinion.

adequate education or that he likely will be deprived of such an education if the court does not grant relief pursuant to the IDEA.[3] Rather, the gravamen of the plaintiffs' IDEA claim is that the defendants owe Piedmont and Woodside for the costs of educating John Doe.

In *Emery v. Roanoke City School Board*, the Fourth Circuit recently examined a student's right to be reimbursed for tuition expenses that the student did not pay. 432 F.3d 294 (4th Cir. 2005). In *Emery*, the student sought reimbursement for educational expenses incurred at a private school. *Id.* at 296. The student paid none of the educational expenses. *Id.* at 297. Finding that the student lacked standing, the *Emery* court observed:

> Standing doctrine requires that reimbursement should flow only to those who actually expend resources, whether it be the *parents* . . . or the *child* . . . . In the usual case, the parents of the disabled child will be the appropriate ones to seek reimbursement because they will have incurred the expense and suffered the subsequent monetary injury. . . .
>
> Plaintiff here challenges the failure of the RCSB to provide reimbursement for the Cumberland expenses. But he failed to prove that he satisfies the constitutional requirement that he suffer an injury in fact with regard to this subsidiary injury. Crucially for the purposes of standing, he suffered no out-of-pocket loss himself for the services that Cumberland provided. . . . Plaintiff has failed to show how awarding him this amount would be anything other than a windfall.

*Id.* at 299 (citations omitted). The court thus found that because "the plaintiff has no legally cognizable injury in fact, he has no standing to sue for reimbursement in this case." *Id.* at 300.

---

[3] The plaintiffs assert in general terms in the Complaint that John Doe has been discriminated against by the defendants' failure to provide him with a "free and appropriate public education." (Compl. ¶ 40.) However, this appears to refer to the defendants' failure to pay for John's education and not the quality of education he received. The plaintiffs did not assert or provide any evidence indicating that John was deprived of an appropriate education while living at Piedmont or at any other time. Indeed, paragraph 29 of the Complaint alleges, "John Doe has been educated by Piedmont in conformance with the standards of the DOE and DHHR." In addition, Ms. Doe testified: "I didn't oppose [treatment at Piedmont] because it was the closest location. I was assured that the treatment there was equal to what [John] needed from the advice of the physicians at Highland Hospital." (Jane Doe Dep. 62.)

Ms. Doe and her son similarly failed to show an injury in fact. Ms. Doe readily acknowledged that she has not paid for any of her son's educational expenses. (Jane Doe Depo. 56.) In addition, the plaintiffs have not alleged that Piedmont has sought payment from Ms. Doe for the costs associated with educating her son or that she expects to be held responsible for these costs. To the contrary, the plaintiffs have implied that the opposite is true, stating: "Piedmont and Woodside are the only entities that have standing to seek payment for the services they provided because in each instance, the child received the educational services and did not pay, and thus did not suffer a monetary loss." (Pls.' Opp. to WVDOE's Mot. for Summ. J. 2.)

Applying the reasoning of *Emery* (and the plaintiffs), the Court **FINDS** that the plaintiffs failed to establish that John and Jane Doe suffered a cognizable injury in fact and thus lack standing to assert an IDEA claim.[4]

### B.    Plaintiffs' Rehabilitation Act claim

The plaintiffs claim they were discriminated against in violation of Section 504 of the Rehabilitation Act. (Compl. ¶ 45–51.) Congress enacted the Rehabilitation Act to "empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society . . . ." 29 U.S.C. § 701(b) (2000). Section 504 of the Act

---

[4] The court notes that even if Ms. Doe and her son had standing to assert an IDEA claim, their IDEA claim would face other significant challenges. Most notably, the plaintiffs have failed to justify why they named the WVDOE and WVDHHR as defendants instead of the appropriate local education agency. *See* W. Va. Code § 18-20-1 (2003) (providing that county boards of education are responsible for establishing and maintaining special education programs for all exceptional children between five and twenty-one years of age). In addition, the defendant has presented credible evidence indicating that Ms. Doe was aware of the procedural safeguards used by West Virginia to comply with the IDEA. Finally, because John Doe no longer resides at Piedmont, the plaintiffs' IDEA claim may be moot. Because the plaintiffs lack standing to bring an IDEA claim, however, the court withholds ruling on these issues.

provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reasons of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Id.* § 794.

The plaintiffs' Rehabilitation Act claim has three fatal flaws. First, and most important, the plaintiffs have failed to show that John Doe was denied a protected benefit or interest. The plaintiffs base their Rehabilitation Act claim on their assertion that John has been denied a free and appropriate education. As the court has discussed at length, however, the plaintiffs do not contend that John did not receive an education that complied with federal and state requirements or that his mother is responsible for paying for his educational expenses incurred at Piedmont. Accordingly, the court **FINDS** that John Doe has not been denied a benefit or interest protected by the Rehabilitation Act.

Second, even if the court found that the defendants denied John a protected interest, the claim fails to state, and the plaintiffs have failed to show, that the defendants discriminated against John Doe *because of* a disability. To establish a violation of section 504, "plaintiffs must prove that they have been discriminated against–that they were 'excluded from the employment or benefit *due to discrimination* solely on the basis of the disability.'" *Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 528 (4th Cir. 1998) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) (emphasis in original)). The heart of the plaintiffs' Rehabilitation Act claim lies in paragraph 49 of the Complaint, which states, "Defendants have discriminated against John Doe . . . in violation of the Rehabilitation Act by denying them full entitlements to a free and appropriate public education to which they have a right." (Compl. ¶ 49.) This statement fails to allege properly that John was denied a right or discriminated against *because of* a disability. Indeed, the Complaint lacks any allegations

that the defendants discriminated against John Doe *because of* a disability.

The court also looks to the defendants' motives to determine whether John was denied a benefit or discriminated against *because of* a disability. In the context of the education of disabled children, "either bad faith or gross misjudgment should be shown before a § 504 violation can be made out . . . ." *Id.* (citations omitted). The plaintiffs simply did not assert that the defendants' conduct was undertaken in bad faith or that they exercised gross misjudgment. The court **FINDS** that, absent any indicia of intentional misconduct or discrimination, the plaintiffs have failed to show that John Doe was subjected to discrimination *because of* his disability.

Finally, the plaintiffs failed to assert an actionable Rehabilitation Act claim because their claim merely recites the plaintiffs' IDEA claim. A Rehabilitation Act claim must consist of more that a restated IDEA claim. *See id.* at 528-29. In this case, the plaintiffs' Rehabilitation Act claim, like their IDEA claim, is based solely on their contention that the defendants denied John a free and appropriate education. Their Rehabilitation Act claim is therefore a mere recitation of their IDEA claim. For this reason, and the others provided, the court **FINDS** that the plaintiffs failed to present an actionable Rehabilitation Act claim.

### C.     Plaintiffs' ADA claim

The shortcomings of the plaintiffs' ADA claim closely mirror the shortcomings of their Rehabilitation Act claim. Pursuant to Title II of the ADA, "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132 (2000) (emphasis added). Accordingly, a plaintiff asserting a Title II ADA claim must show that he was "excluded from [a] benefit due to discrimination solely on the basis of the

14

disability." *See Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999) (citation omitted). In addition, like a Rehabilitation Act claim, an ADA claim brought in the educational context must show "either bad faith or gross misjudgment." *See Cone v. Randolph County Schs.*, 302 F. Supp. 2d 500, 513 (M.D.N.C. 2004) (citing *Sellers*, 141 F.3d at 529).

For the reasons explained in the analysis of the plaintiffs' Rehabilitation Act claim, the court **FINDS** that the plaintiffs failed to show that (1) John Doe was denied a protected benefit or right; (2) he was discriminated against *because of* a disability; or (3) the defendants acted in bad faith or exercised gross misjudgment. The court accordingly **FINDS** that the plaintiffs failed to present a cognizable ADA claim.

### D.     Plaintiffs' federal constitutional claims

Plaintiffs assert federal constitutional claims that allege violations of the Privileges and Immunities Clause, the Commerce Clause, and the parties' Fourteenth Amendment rights to due process and equal protection.

As an initial matter, the plaintiffs fail to articulate any reasonable grounds for their claims brought pursuant to the Privileges and Immunities Clause or the Commerce Clause. Because the court cannot discern any plausible legal foundation for these claims, the court **FINDS** that the plaintiffs have failed to assert actionable Privileges and Immunities Clause or Commerce Clause claims.

The court next addresses the plaintiffs' due process claim. The right to procedural due process requires that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*,

455 U.S. 422, 428 (1982). To state a cognizable due process claim, a plaintiff must therefore assert that he or she has been deprived of a property interest protected by the Constitution. *See Local 342, Long Island Public Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994).

Here, the plaintiffs contend that "Piedmont and Woodside have been deprived of property, namely their right to be compensated for the services Piedmont and Woodside provided to the State of West Virginia." (Pls.' Resp. to WVDOE's Mot. for Summ. J. 9.) As argued by the WVDOE, the right of Piedmont and Woodside to receive compensation for services provided to the State of West Virginia is essentially a contract claim, which cannot serve as a basis for a due process claim. The Fourth Circuit has held that "[a] mere breach of [a] contractual right is not a deprivation of property without *constitutional* due process of law. . . . Otherwise, virtually every controversy involving an alleged breach of contract by a government . . . would be a constitutional case." *Coastland Corp. v. County of Currituck*, 734 F.2d 175, 178 (4th Cir. 1984) (citing *Jiminez v. Almodovar*, 650 F.2d 363 (1st Cir. 1981). Because the plaintiffs have failed to show that they have been deprived of a constitutionally-protected property interest, the court **FINDS** that their due process claim fails to state a cognizable claim.

The plaintiffs' equal protection claim is also deficient. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "It requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). As with any federal claim, however, a plaintiff asserting an equal protection claim must establish standing. *See Indep. Enters. Inc. v. Pitt. Water and Sewer Auth.*, 103 F.3d 1165, 1176 (3d

Cir. 1997). Because John Doe was not deprived of an education, the court **FINDS** that the defendants' refusal to pay for John's education did not deprive him of a constitutionally protected interest sufficient to create standing for an equal protection claim. In addition, the court **FINDS** that an equal protection claim brought by Piedmont and Woodside fails because the plaintiffs have not offered any evidence that Piedmont or Woodside were treated differently than any other similarly situated facility.

For the reasons stated, the court **FINDS** the plaintiffs have failed to present any cognizable federal Constitutional claims.

### E. Plaintiffs' § 1983 claim

The plaintiffs assert that "[d]efendants are . . . liable to the Plaintiffs for each and every deprivation of a federal or state right pursuant to 42 U.S.C. § 1983." (Compl. ¶ 85.) Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, . . . subjects, or causes to be subjected, any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983 (2000). Having dismissed the plaintiffs' other federal claims, the court **FINDS** that the plaintiffs' § 1983 claim fails to show that John and Jane Doe were deprived of a federal right. *See Roush v. Roush*, 767 F. Supp. 1344, 1354 (S.D. W. Va. 1991) (stating "a Section 1983 action requires the deprivation of a constitutional right . . ."). The court accordingly **FINDS** that the plaintiffs' § 1983 claim fails.

### F.   Plaintiffs' request for declaratory judgment

In assessing whether the plaintiffs' request for declaratory judgment survives summary judgment, the court examines whether the plaintiffs have stated or shown an actual controversy within this court's jurisdiction. The Declaratory Judgment Act provides, "In a case of actual controversy *within its jurisdiction* . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201 (2000) (emphasis added). A case meets § 2201's "actual controversy" requirement only if the plaintiff "presents a controversy that qualifies as an actual controversy under Article III of the Constitution." *Volvo Constr. Equip. N.A., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (citation omitted).

Because John Doe was not deprived of an appropriate education, his mother did not pay for his education, and Piedmont and Woodside do not have viable federal claims, the court **FINDS** that this case does not present an "actual controversy." Accordingly, the court further **FINDS** the plaintiffs' request for declaratory relief should not survive summary judgment.

### G.   Plaintiffs' state law claims

The plaintiffs assert state claims that allege a breach of contract and violations of the West Virginia Constitution, the West Virginia Human Rights Act, and the West Virginia Education of Exceptional Children Act. The court must examine whether it should retain supplemental jurisdiction over these state claims. *See* 28 U.S.C. § 1367 (2000).

When a federal court has original jurisdiction in a civil action, the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* § 1367(a). When the basis for federal jurisdiction is dismissed, however, a court has discretion to retain or dismiss pending state law claims.[5] *See Id.* § 1367(c); *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). In exercising this discretion, the court considers the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan* 58 F.3d at 110. When exercising their discretion, trial courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Id.*

After considering the factors set forth in *Shanaghan*, and giving great weight to the fairness factor, the court **FINDS** that these factors militate against exercising supplemental jurisdiction over the plaintiffs' state law claims. The court accordingly declines to exercise supplemental jurisdiction over the plaintiffs' state law claims.

## IV. CONCLUSION

Because the plaintiffs have failed to present viable federal claims, and the court does not exercises its discretion to grant supplemental jurisdiction over the plaintiffs' state claims, the court **GRANTS** the defendants' motions for summary judgment and **DENIES** the plaintiffs' motion for partial summary judgment. The court orders that the case be **DISMISSED**.

---

[5] 28 U.S.C. § 1367(c)(3) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.us courts.gov.*

        ENTER:  January 31, 2006

        _____
        JOSEPH R. GOODWIN
        UNITED STATES DISTRICT JUDGE

Charles M. Johnson, Jr., Charleston, WV

Christopher S. Morris, Charleston, WV

Harry F. Bell, Jr., Charleston, WV

Mychal S. Schulz, Charleston, WV

Robert J. Moss, Washington, DC

Robert M. Stonestreet, Charleston, WV

<u>For Plaintiffs Piedmont Behavioral Health Center, LLC,</u>

<u>Woodside Hospital, LLC, Jane Doe, and John Doe</u>

Charles R. Bailey, Charleston, WV

G. Dustin Foster, Charleston, WV

<u>For Defendants David Stewart and West Virginia</u>

<u>Department of Education</u>

Darrell V. McGraw, Jr., Charleston, WV

William P. Jones, Charleston, WV

<u>For Defendants Paul L. Nusbaum and West Virginia</u>

<u>Department of Health and Human Resources</u>